June 22, 2018

**Supreme Court**

No. 2016-12-Appeal.
No. 2016-145-Appeal.
(WC 12-379)

James H. Arnold et al.        :

v.        :

Thomas L. Arnold, Jr., individually and in  :
his capacity as Trustee of the Thomas L.
Arnold, Jr. Trust, et al.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2016-12-Appeal.
No. 2016-145-Appeal.
(WC 12-379)

James H. Arnold et al.       :

v.       :

Thomas L. Arnold, Jr., individually and in  :
his capacity as Trustee of the Thomas L.
Arnold, Jr. Trust, et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**

*"Something there is that doesn't love a wall[.]"*[1]

Almost a century ago, the plaintiffs' predecessors in title acquired by deed an easement over the defendants' property to access the adjacent Charlestown Pond.[2]  Many decades,

---

[1] Robert Frost, "Mending Wall," in COMPLETE POEMS OF ROBERT FROST 47 (Henry Holt and Company, Inc., eds., 1949).

[2] The captioned plaintiffs are James H. Arnold, Sandra B. Arnold, Jonathan Arnold, and Elinor St. John Arnold, in her capacity as Trustee of the Lemuel H. and Elinor St. John Arnold Trust Agreement.  The captioned defendants are Thomas L. Arnold, Jr., individually and in his capacity as Trustee of the Thomas J. Arnold, Jr. Trust, and Lillian B. Arnold, individually and in her capacity as Trustee of the Lillian B. Arnold Trust.

On March 2, 2015, the defendants filed a Suggestion of Death Upon the Record, pursuant to Rule 25(a)(2) of the Superior Court Rules of Civil Procedure, notifying the Superior Court of the death of codefendant Thomas L. Arnold, Jr., during the pendency of this action below.  On November 23, 2016, during the pendency of this appeal, a Suggestion of Death Upon the Record was filed in this Court notifying the Court of the death of codefendant Lillian B. Arnold, and on February 20, 2017, the same was filed concerning the death of plaintiff Elinor St. John Arnold.

- 1 -

pathways, and dock locations later, a disagreement as to the parties' property rights arose. Litigation commenced, and, eventually, after lengthy and painstaking negotiations, a settlement was reached that resulted in easements in favor of the plaintiffs. The Superior Court entered a consent order embodying the terms of the agreement. Sadly, however, the relationship between these neighboring family members did not remain harmonious.

Yet another lawsuit was spawned when the defendants fenced the fifteen-foot-wide confines of the easement that was created by the agreement and consent order. The plaintiffs claimed that the defendants' actions stymied their ability to tow boats to and from their dock because they could no longer (1) navigate the "elbow" of the right-of-way or (2) execute a three-point turn at the water's edge, thereby frustrating the purpose of the consent order and the easement. Thus, the plaintiffs initiated litigation anew to reinstate what they contended was the intended purpose of the consent order: to "pass and re-pass by vehicles * * * for the purpose of hauling, launching, or retrieving boats * * *."

A nonjury trial, entailing a joint statement of undisputed facts, joint exhibits, and testimony from one plaintiff and one defendant, was held in the Superior Court. The plaintiffs appeal from the ensuing judgment denying their claims in whole. The defendants cross-appeal from the trial justice's denial of their request for attorneys' fees. For the reasons set forth below, we affirm the judgment of the Superior Court.

On May 18, 2017, this Court entered an order granting the defendants' motion to substitute Thomas L. Arnold III as a party to this suit in place of his deceased parents in their individual capacities. On November 21, 2017, this Court granted the plaintiffs' motion for leave to substitute Carolyn L. Arnold, in her capacity as Successor Trustee of the Elinor St. John Arnold Trust, for her deceased mother.

# I

## Facts[3] and Travel

### A

### The Previous Lawsuits

In this appeal, we are called upon to put an end to a long-standing feud between distant relatives over their respective property rights.[4]  The dispute centers on property located in the Arnolda section of Charlestown, an area that derives its name from the original settler and owner of much of the surrounding land, Thomas L. Arnold.[5]  In 1927, Thomas conveyed Lot 24 on Charlestown Tax Assessor's Plat 7 to members of his family, creating the so-called "Lighthouse property."  The deed included the following grant:

> "a right of way to shore of Charlestown Pond or Bay, and the facilities of large crib dock and small boat house, and also a right of way to the ocean beach over the land of the Grantor and the privilege of building a small bath house for two families and guest not further than twenty (20) feet south of the large bath house now owned by the Grantor."

At all times relevant to this dispute, plaintiffs owned the Lighthouse property, Lot 24. Lying east and south of the Lighthouse property and separating it from the Charlestown Pond is Lot 23, owned by the Mahony family.  South of Lots 23 and 24 and fronting the pond is Lot 31-2, owned by defendants.  The defendants live on the adjoining Lot 31-1.  *See* Appendix (relevant portion of Charlestown Tax Assessor's Plat 7).

---

[3] Unless otherwise noted, we glean the facts from the amended joint statement of undisputed facts and from the written decision of the trial justice.

[4] As the trial justice in this case so aptly remarked: "I think this case is really sad.  It's a case where people with so much have so little, and they're playing games and that's what's most troubling."

[5] Because many of the individuals referenced in this opinion share the same last name, it is necessary to refer to some of them by their first names.  We intend no disrespect by doing so.

Eventually, the scope and nature of the rights conveyed to plaintiffs in the original 1927 easement became the subject of litigation. In 2007, plaintiffs brought suit against the Mahonys, seeking "a declaration giving them the right to pass by foot or vehicle across Lot 23 en route to the Pond on alternative theories of express or prescriptive easement." Then, in 2008, plaintiffs also sued defendants in a separate action, likewise seeking "a declaration of vehicular access to Charlestown Pond across Lot 31-2 on the same alternative easement theories * * *." The Mahonys and defendants lodged trespass counterclaims against plaintiffs in those cases. At the heart of both actions was the Lighthouse property's access to its floating, seasonal dock at the shore of the pond.

A justice of the Superior Court (the first trial justice) consolidated the cases, and a nonjury trial commenced on July 26, 2010. On the second day of trial, however, the proceedings were suspended so that the parties could attempt to negotiate a settlement. Over the course of the next three days, the parties and counsel discussed the location and size of plaintiffs' right-of-way to the pond as well as their dock. The parties and their counsel walked the site to make sure that the evolving terms of a working agreement accurately tracked the field conditions. These negotiations proved fruitful, ultimately resulting in an agreement, and the parties presented the first trial justice with a proposed consent order detailing the agreement's terms on July 30, 2010. After reviewing the contents of the consent order and polling each party individually to verify his or her assent to the terms of the agreement, the first trial justice approved the settlement. She applauded the parties and counsel for their difficult but successful negotiations, remarking that she had never before "witnessed this long of a settlement process while still potentially retaining the case for trial." Thereafter, the consent order was entered as an order of the Superior Court.

**B**

**The Consent Order**

The consent order began:

> "1.    This Consent Order shall resolve, declare, and determine for all purposes the presently disputed rights, duties and obligations of the parties with respect to easements (express, implied, or prescriptive) benefiting the real estate now known as Lot 24 * * * over real estate now known as Lot 23 * * * and Lot 31-2 * * * including but not limited to any and all such easements or rights of way as they relate to Lots 23 and 31-2 as are expressed in that certain 1927 deed from Thomas L. Arnold * * *."

The consent order then created two easements benefiting plaintiffs' property.[6]  The first was the "Pedestrian / Golf Cart Easement," which would begin at the southern edge of Lot 24 and cross Lot 23, the Mahony property, and could be, under the terms of the easement, accessed by foot or a small vehicle no larger than a golf cart for the purpose of accessing and transporting supplies to the Lighthouse property's dock.

The second, and most important, was the "Launching and Retrieval Easement" across both Lot 23 and Lot 31-2, defendants' property.  The Launching and Retrieval Easement would begin at the southern edge of Lot 24 and cross Lot 23, where it would intersect with the Pedestrian / Golf Cart Easement at the bottom of Lot 23.  From there, the Launching and Retrieval Easement would make a ninety-degree turn and head east across the northern boundary of Lot 31-2, ending at the shore of Charlestown Pond.  The precise terms of the Launching and Retrieval Easement bear repeating in full:

---

[6] Attached to the consent order was a "sketch plan" depicting the agreed-upon easements.  The consent order provided that the owners of Lots 23 and 24 would split the cost of employing a professional surveyor to create a "definitive plan."  That definitive plan would replace the sketch plan and would be attached to an amended and restated consent order, which, by the terms of the consent order, "shall be recorded in the Land Evidence Records of the Town of Charlestown."

"3. The 'Launching and Retrieval Easement' as used herein, shall mean a right and easement to pass and re-pass by vehicles to and from Lot 24 over Lot 23 and Lot 31-2 for the purpose of hauling, launching, or retrieving boats owned by the owners of Lot 24 not exceeding sixteen (16) feet in length to or from the Existing Lot 24 Dock or the Relocated Lot 24 Dock, as defined herein. The area in which the 'Launching and Retrieval Easement' may be exercised shall be:

"(i) with respect to passing and re-passing over Lot 31-2, that fifteen (15) foot area as shown on that Plan of Subdivision at 'Arnolda' in the Town of Charlestown prepared by Alan J. Easterbrooks, C.E. and recorded at Plat Book 12, Page 61 in the Town of Charlestown Land Evidence Records ('Subdivision Plan'), maintained as cleared, mowed grass at least ten (10) feet wide, except, however, that if the Lot 24 Dock is not relocated to the fifteen (15) foot wide area designated on the Subdivision Plan in accordance with the provisions of Section 12 hereof, then the area in which the Launching and Retrieval Easement may be exercised shall be a fifteen (15) foot wide area located in the extreme northerly and easterly portion of Lot 31-2 as will permit access to the Lot 24 Dock or Relocated Lot 24 Dock as aforesaid, noting that the same area described in this Sub-Section shall also constitute the area for the Pedestrian / Golf Cart Easement as same passes over Lot 31-2; and

"(ii) with respect to passing and re-passing over Lot 23, two track tire lanes of gravel with center grass median, total of eight feet, all as shown and set forth on the Sketch Plan to be replaced by the Definitive Plan.

"The Launching and Retrieval Easement shall not be exercised prior to April 15 or after November 12 of each year, and shall be exercised only on a 'one time in, one time out' basis with respect to boats duly maintained at the Lot 24 Dock or the Relocated Lot 24 Dock or to address an emergency such as an impending natural disaster or extraordinary circumstance threatening safety or property."

Additionally, in connection with the establishment of the Launching and Retrieval Easement, the consent order addressed the relocation of plaintiffs' dock. The Lighthouse dock, benefiting Lot 24, in existence at the time of entry of the consent order was "located on Lot 31-2 approximately 50 ft. south of its boundary with Lot 23, which dock is a 'floating dock'

- 6 -

approximately 8 ft. wide and 16 ft. long." The consent order, however, provided for relocation of that floating dock:

> "12. The owners of Lot 31-2, with the cooperation of the owners of Lot 24, as joint applicants as necessary, shall with due diligence and in good faith cooperate in filing an application within forty-five (45) days of entry of this Consent Order with the [Coastal Resources Management Council (CRMC)] for permission to relocate the Lot 24 Dock to the north of its current location to a location * * * within or as close as possible to the area of the Launching and Retrieval Easement at its eastern terminus on Lot 31-2 where same meets Charlestown Pond. * * * The cost associated with the permitting process, including any required dredging or removal of coastal vegetation, shall be borne solely by the owners of Lot 31-2. The cost to physically move the Lot 24 Dock northerly pursuant to any permission granted by CRMC shall be borne solely by owners of Lot 24."

With respect to who could access that dock by way of the newly created easements, the consent order declared:

> "6. Only the owners of Lot 24 and their houseguests shall have the right and benefit of the Pedestrian / Golf Cart Easement and the Launching and Retrieval Easement as aforesaid, and the owners of Lots 23 and 31-2 and their agents shall not impede, impair, block or hinder any part of their use thereof as aforesaid in any way, except that (i) a 'post and chain' device with a lock may be maintained on Lot 31-2, installed in or about 1988, in the location shown on The Definitive Plan, provided that a key to the same is always provided to the owners of Lot 24 for their exclusive use * * *."

Finally, the consent order closed as follows:

> "16. The parties agree to dismiss with prejudice all claims and counterclaims in the above consolidated actions, with the parties to bear their own respective court costs and attorneys' fees.
> "17. This Consent Order shall be binding upon all of the parties to the above-consolidated actions, including their grantees, successors, and assigns. This Consent Order shall be recorded in the Land Evidence Records of the Town of Charlestown.
> "18. Any violation of this consent order may subject the violator to contempt of court or other sanctions deemed

appropriate by this Court.  However, the parties agree to attempt to amicably resolve disputes hereunder in good faith without unnecessary Court intervention."

## C

## The Present Lawsuit

*"[T]he parties agree to attempt to amicably resolve disputes [under the consent order] in good faith without unnecessary Court intervention."*

Yet here we are.  Notwithstanding the extensive efforts that they undertook to settle their property dispute, and notwithstanding their pact to amicably resolve future disputes arising out of the settlement without running to court, the owners of Lot 24—plaintiffs—and Lot 31-2—defendants—were back in the Superior Court a mere two years after entering into the consent order.[7]  On June 13, 2012, plaintiffs filed a complaint alleging that defendants had constructed a fence along the southern boundary of the fifteen-foot-wide easement on Lot 31-2.[8]  According to plaintiffs, as a result of the newly erected fence, they were no longer able to launch and retrieve their boat by using the Launching and Retrieval Easement.  Doing so, plaintiffs claimed, required that they have the ability to turn their vehicle around at the shore to get the trailing boat into the water, which thereby required that they temporarily stray beyond the confines of the easement for that limited purpose.  The plaintiffs also complained that the fence extended to the elbow of the easement—where it makes a sharp turn at the boundary of Lots 23 and 31-2—and, consequently, a vehicle towing a boat could not traverse that part of the easement.  These obstructions, plaintiffs alleged, prevented them from using the Launching and Retrieval Easement for its intended purpose—that is, launching and retrieving their boats.  The plaintiffs

---

[7] The owners of Lot 23, the Mahonys, were not involved in the 2012 lawsuit.

[8] The plaintiffs later filed an amended complaint, and defendants responded with an answer to the amended complaint and counterclaim.  Therefore, in this opinion, all references to the pleadings are to the amended pleadings.

stated that they had discussed the issue with defendants, but that their discussions had borne no fruit.

That was not the only dispute as to the terms of the consent order that was raised in the complaint. The plaintiffs also claimed that the post-and-chain device that had been installed in 1988, as discussed in § 6(i) of the consent order, had not spanned the entire north-south width of the right-of-way; rather, it left a "courtesy gate" approximately three feet wide on the northern side of the path so that pedestrians could easily walk down to the Lighthouse dock. The plaintiffs alleged that defendants had reinstalled the post-and-chain device in the location permitted by the consent order, but that the new device stretched across the entirety of the easement, thereby preventing pedestrian access without unlocking the chain or ducking under it. The plaintiffs claimed that, when they alerted defendants to this discrepancy, defendants refused to reinstall the courtesy gate.

Lastly, there was a dispute regarding the relocated Lighthouse dock itself. The plaintiffs described the Lighthouse dock that existed prior to entry of the consent order as "a floating dock accessed by a ramp secured by two posts roughly four feet high inserted in the ground. These posts also marked the site where the owners of Lot 24 would install the Lighthouse Dock each season." However, plaintiffs alleged that the posts had disappeared in December 2009. According to plaintiffs, when defendants applied to CRMC for permission to relocate the dock, the plan that they submitted with the application, and which CRMC had approved, neglected to include the dock posts because defendants considered them to be "unsightly." The plaintiffs alleged that "CRMC considers the omission of these posts on the approved plan as immaterial, and will re-issue the prior dock approval administratively upon production of a plan that shows the posts." Nevertheless, plaintiffs contended, defendants refused to permit plaintiffs to install

the dock posts at the terminus of the Launching and Retrieval Easement, and they refused to submit a plan showing the posts for approval by CRMC.

In sum, plaintiffs asked the Superior Court to: (1) declare and adjudicate that plaintiffs had the right under the consent order to go beyond the strict fifteen-foot-wide confines of the Launching and Retrieval Easement to turn vehicles around when launching and retrieving boats, and enter a permanent injunction ordering defendants to remove the fence along the perimeter of the easement on Lot 31-2; (2) enter a mandatory permanent injunction ordering defendants to reinstall the courtesy gate for pedestrians that existed with the 1988 post-and-chain device; and (3) declare and adjudicate that plaintiffs had the right to install the dock posts as they existed at the old Lighthouse dock.

The defendants filed a counterclaim, alleging that plaintiffs had refused to acknowledge and execute an amended and restated consent order with the final definitive plan, consistent with CRMC's approval of the relocated Lighthouse dock, attached thereto in accordance with the consent order. Therefore, defendants alleged breach of contract and sought (1) a declaratory judgment in their favor, (2) an injunction requiring plaintiffs to accept the final definitive plan and execute a stipulation of dismissal of the lawsuits giving rise to the consent order, and (3) an award of attorneys' fees and costs.

## D

### The Trial Testimony

On July 16, 2014, the case proceeded to a one-day, nonjury trial before a second justice of the Superior Court (the trial justice). James H. Arnold testified for plaintiffs, and Lillian B. Arnold testified for defendants. We summarize those parts of their testimonies that are pertinent to this appeal.

James testified that he has been a seasonal resident at the Lighthouse property for his entire life. He said that, from 1978 until 2010, he helped launch boats at the old Lighthouse dock location. That, he explained, required a vehicle towing a boat trailer to execute a three-point turn to "back the trailer into the water to deposit or pick up the boat." He said that that was what had occurred every time a boat had been launched. He testified that different vehicles and different boats had been used over the years; the largest hauling vehicle had been an SUV and the smallest a Cub Cadet tractor. At the time of trial, James said that he owned a seventeen-foot boat trailer that was used to haul a fourteen-foot skiff or sailboat.

James testified that, before plaintiffs could relocate the Lighthouse dock to the shore at the end of the Launching and Retrieval Easement, defendants installed a wooden fence on Lot 31-2 along the boundary of the easement and right at the location where plaintiffs would need to execute a three-point turn.[9] According to James, the presence of the fence made that task impossible, thus nullifying the benefit of the easement. Further, James said that plaintiffs could not even reach that end part of the easement due to the installation of a chain barrier at the elbow of the easement, where the easement crossed from Lot 23 onto Lot 31-2. James said that, to his knowledge, it was the Mahonys who had installed those chains on the northern side of the easement. The southern side, on defendants' property, was confined by a wooden fence like that which existed farther down the easement in the area of the dock. Consequently, according to James, plaintiffs' ability to launch and retrieve boats was completely frustrated because it was not feasible to "get around [that curve] with a vehicle of any sort and a boat trailer."

---

[9] Although parts of James's testimony refer to a chain barrier first being installed where the three-point turn would be necessary, he clarified that it was indeed a wooden fence that had been placed there eventually. The final definitive plan shows that sections of the perimeter of the Launching and Retrieval Easement are lined by chains and others by a fence. Our review of the record indicates that the disputed three-point-turn location involves the wooden fence.

James testified that he understood the terms of the consent order and that he was present when it was negotiated. Also, he acknowledged that he knew at the time he agreed to the consent order that the fifteen-foot width of the Launching and Retrieval Easement would be inadequate to make the necessary three-point turn. He said that, rather than negotiating for a greater width, he had simply presumed plaintiffs "would continue to do what [they] had done for the previous [thirty-one] years"—namely, go outside the confines of the easement for the purpose of navigating a three-point turn. James testified that he has not used the Launching and Retrieval Easement to launch a boat since defendants erected the wooden fence along the southern bound of the easement.

James also discussed the issues of the post-and-chain device and the dock posts. He explained that, prior to entry of the consent order, the device consisted of a chain that was hooked into a tree and extended most of the way across the easement to a post, leaving an open space of a few feet to the side of the post. As a result, people walking down to the dock could go around the chain rather than having to duck under it. According to James, however, after the consent order was entered, defendants extended the post-and-chain device across the entire north-south width of the Launching and Retrieval Easement. James testified that he had not addressed the so-called courtesy gate in the consent order because he was under the impression that the device had to be the same as had existed in the past.

With respect to the dock posts, James said that they had existed at the previous Lighthouse dock location from the time the dock was built in 1978 until the posts went missing in 2009. He testified that he had received permission from CRMC to replace them but had never done so. He conceded that, at the time the Lighthouse dock was being relocated in accordance with the consent order, the application that had been submitted to CRMC by defendants, which

- 12 -

he had approved, made no mention of the dock posts. James explained that the posts are necessary so that the ramp that leads to the floating dock can be extended and for the dock to be replaced in its precise location each spring. He said that, without the posts, plaintiffs must leap over the water's edge to reach the dock at high tide.

Lillian, meanwhile, testified that she had lived in or visited the Arnolda section of Charlestown since 1959. At the time of trial, she and her husband, codefendant Thomas Jr., were permanent residents of Charlestown, living in a home on Lot 31-1; they also owned Lot 31-2. Lillian explained that the fifteen-foot width of the Launching and Retrieval Easement was important to defendants during the intensive consent order negotiations because their son planned to build a home on Lot 31-2. According to Lillian, the local zoning ordinance had setback requirements that would require the house to be located near the right-of-way.

Lillian acknowledged that she did not recall whether defendants had notified plaintiffs before they erected the fence along the perimeter of the Launching and Retrieval Easement. However, it was her belief that plaintiffs had been aware of it because the fence was depicted on the engineering plan submitted to CRMC. Lillian also discussed the possibilities of using different sized vehicles to launch boats and another option of using a ball-hitch on the front of a vehicle to push boats along the right-of-way, and thereby eliminate the necessity of a three-point turn. Lillian testified that defendants had fulfilled their end of the bargain by clearing the easement area of certain trees and by leveling the ground.

With regard to the courtesy gate and dock posts, Lillian maintained that those topics had never been addressed during the course of negotiations, nor were they addressed in the consent order. She further explained that the so-called courtesy gate had never been installed for the benefit of the Lighthouse property owners, and problems with trespassers over the years had

necessitated a chain spanning the entire width of the right-of-way. Lillian also testified about her suspicion that plaintiffs desired to install permanent dock posts in cement, unlike those installed at the original Lighthouse dock. Finally, Lillian attested that, as of June 1, 2010, she had expended approximately $16,600 in legal fees defending against plaintiffs' suit.

## E

## The Decision

The trial justice rendered a written decision on May 14, 2015. First, as to the Launching and Retrieval Easement, the trial justice determined that the consent order unambiguously specified the width of the easement and did not provide any exception to its terms. The trial justice found that plaintiffs were aware, when they negotiated and entered into the consent order, that fifteen feet was insufficient space to execute a three-point turn. Nonetheless, they accepted that term based on their assumptions that no fence would be erected and that they would be able to go beyond the agreed-upon confines of the easement to turn around. The trial justice found that the only beneficial width term that plaintiffs were able to successfully negotiate was to increase the cleared space on the easement from eight to ten feet. Thus, giving the terms of the consent order their plain and ordinary meaning, and after reviewing the circumstances surrounding the negotiation of the consent order, the trial justice concluded that the width of the Launching and Retrieval Easement was fifteen feet, ten of which were to remain cleared. Accordingly, the trial justice declared that the easement provided plaintiffs with no authority to go beyond the fifteen-foot right-of-way, and she denied their request for injunctive relief.

Second, with respect to the post-and-chain device, the trial justice determined that the consent order was silent with respect to the courtesy gate. The trial justice found that the post-and-chain device permitted by the consent order and the courtesy gate that existed historically

- 14 -

were two different features, and plaintiffs had failed to negotiate for such a gate. Therefore, she concluded that it would be inappropriate for her to consider extrinsic evidence to modify an unambiguous agreement. The trial justice again denied plaintiffs their requested injunctive relief.

Third, concerning the dock posts, the trial justice likewise determined that there was no reference to the posts in the consent order and that she was constrained from adding such a term to the agreement. The trial justice found that plaintiffs were put on notice of and given an opportunity to object to the absence of the dock posts in the engineering materials, photograph, and plan submitted to CRMC. In fact, the trial justice found that James had personally presented the CRMC approval letter to the town for the purpose of recording it in the land evidence records. Thus, the trial justice declared, plaintiffs did not have the right to reinstall posts at the relocated floating dock.

Finally, regarding defendants' counterclaim for breach of contract, the trial justice found it to be undisputed that the parties had entered into a valid and binding contract in the form of the consent order. The trial justice thus decided that plaintiffs' failure to comply with the terms of the consent order—in particular, their refusal to approve the definitive plan, execute an amended and restated consent order, and terminate the previous lawsuits—constituted a breach of contract, and she ordered them to comply therewith. At a subsequent hearing, the trial justice denied defendants an award of attorneys' fees. The plaintiffs timely appealed, and defendants cross-appealed with respect to the denial of their request for attorneys' fees.

## F

## The Appeal

In this case, we are confronted with the same issues as was the trial justice below: whether plaintiffs have the right under the consent order to (1) stray beyond the express dimensions of the Launching and Retrieval Easement for the purpose of launching and retrieving boats; (2) install dock posts at the relocated Lighthouse dock; and (3) enjoy the benefits of a courtesy gate next to the post-and-chain device. The plaintiffs also raise evidentiary issues concerning the trial justice's consideration of evidence surrounding the negotiation of the consent order.

## II

## Standard of Review

Our standard of review in this case is deferential. First, "[w]e accord great deference to the findings of fact of a trial justice sitting without a jury, and will disturb such findings only when the justice misconceives or overlooks material evidence or otherwise is clearly wrong." *Whittemore v. Thompson*, 139 A.3d 530, 540 (R.I. 2016) (quoting *Granoff Realty II, Limited Partnership v. Rossi*, 823 A.2d 296, 298 (R.I. 2003)). Moreover, "[w]hen the Superior Court exercises its discretion to issue * * * a [declaratory] judgment, its decision should remain untouched on appeal unless the court improperly exercised its discretion or otherwise abused its authority." *Sullivan v. Chafee*, 703 A.2d 748, 751 (R.I. 1997). And, in a similar vein, "a decision to grant or deny injunctive relief is discretionary in nature, and such a decision will not be disturbed on appeal absent a showing of abuse of discretion or error of law." *Rose Nulman Park Foundation ex rel. Nulman v. Four Twenty Corp.*, 93 A.3d 25, 28 (R.I. 2014) (quoting *North End Realty, LLC v. Mattos*, 25 A.3d 527, 530 (R.I. 2011)).

At the same time, however, we "review[] a trial justice's conclusions on questions of law *de novo*." *Bucci v. Lehman Brothers Bank, FSB*, 68 A.3d 1069, 1078 (R.I. 2013) (quoting *Beacon Mutual Insurance Co. v. Spino Brothers, Inc.*, 11 A.3d 645, 649 (R.I. 2011)). Of course, "whether a contract is clear and unambiguous is a question of law." *Id.* (quoting *Beacon Mutual Insurance Co.*, 11 A.3d at 648). And if "a contract is determined to be clear and unambiguous, then the meaning of its terms constitute[s] a question of law" as well. *Id.* (quoting *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 558 (R.I. 2009)). We have said that "[a]lthough [a consent order] receives a court's imprimatur, [it] is in essence a contract and therefore must be construed as a contract * * *." *Vanderheiden v. Marandola*, 994 A.2d 74, 78 (R.I. 2010) (quoting *Now Courier, LLC v. Better Carrier Corp.*, 965 A.2d 429, 435 (R.I. 2009)). Here, then, we will consider *de novo* whether the consent order was clear and unambiguous and, if so, the meaning of its terms.

### III

### Discussion

### A

### Evidentiary Issues

Before we begin our *de novo* review of whether or not the consent order was ambiguous, we first must address plaintiffs' argument that the trial justice erroneously admitted and considered certain irrelevant evidence. The contested evidence revolves around (1) the length and intensity of the negotiations that resulted in the consent order and (2) defendants' subjective reasons for insisting on the width of the Launching and Retrieval Easement.

We can easily dispatch the second of those perceived errors. Our review of the trial justice's decision makes abundantly clear that she never, as plaintiffs allege, "relied" on

- 17 -

defendants' intent to limit the easement to fifteen feet wide. Indeed, the only mention of subjective intent is contained within the trial justice's recitation of the trial testimony. The trial justice simply recited Lillian's testimony that defendants' son planned to build a house on Lot 31-2 near the easement and thus needed to confine its bounds as far as possible.

Furthermore, we are equally convinced that the trial justice's apparent consideration of the length and intensity of the parties' settlement negotiations was not reversible error. The plaintiffs suggest that that evidence was not relevant. But it is fundamental that, "[w]hen sitting without a jury, a trial justice is vested with broad discretion to hear evidence [and] pass on the merits of a claim * * *." *Connecticut Valley Homes of East Lyme, Inc. v. Bardsley*, 867 A.2d 788, 795 (R.I. 2005).

**B**

**The Consent Order**

"In determining whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994). "[A]n agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." *Id.*

"Where no ambiguity is found, it is basic that the intention of the parties must govern *if* that intention can be clearly inferred from the writing and if it can be fairly carried out in a manner consistent with settled rules of law." *W.P. Associates*, 637 A.2d at 356. "When * * * we are confronted with unambiguous contractual words, what is claimed to have been the subjective *intent* of the parties is of no moment." *Young*, 973 A.2d at 560. This is so because "the intent we seek is not some undisclosed intent that may have existed in the minds of the contracting parties but is instead the intent that is expressed in the language of the contract." *Westinghouse*

- 18 -

*Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 581 n.10, 410 A.2d 986, 991 n.10 (1980).

Therefore, "[i]t is firmly settled that the intent of the parties to a written contract is contained in

the writing itself. * * * When the words of a contract are clear and unambiguous, the intent is to

be found only in the express language of the agreement." *Young*, 973 A.2d at 560 (quoting

*Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Board*, 739 A.2d 133, 138 (Pa.

1999)).

In this case, we have absolutely no difficulty concluding that the consent order is clear

and unambiguous. Viewing the agreement in its entirety, and giving its language its plain,

ordinary, and usual meaning, the consent order is not reasonably susceptible to more than one

interpretation. *See W.P. Associates*, 637 A.2d at 356. It is detailed and organized, employs clear

and articulate wording, defines dimensions, refers to external sources with the utmost specificity,

and is generally well-drafted and thorough. It contains no sections that are confusing, internally

inconsistent, or that simply do not make sense. The agreement speaks for itself.

Additionally, the parties' intent in entering into the consent order is manifestly expressed

therein. The agreement begins by explicitly setting forth its purpose: to "resolve, declare, and

determine for all purposes the presently disputed rights, duties and obligations of the parties with

respect to easements * * * benefiting the real estate now known as Lot 24 * * * over real estate

now known as Lot 23 * * * and Lot 31-2 * * *." The consent order then proceeds to lay out the

terms of the parties' agreement as to each disputed right, duty, and obligation pertaining to those

easements.

However, the parties disagree as to the meaning of three particular terms contained in the

consent order. We will apply *de novo* review to those terms. *Bucci*, 68 A.3d at 1078. If we

"find[] that the terms of an agreement are clear and unambiguous, the task of judicial

construction is at an end and the agreement must be applied as written." *W.P. Associates*, 637 A.2d at 356.

**1**

**The Launching and Retrieval Easement**

The first disputed term of the consent order concerns the Launching and Retrieval Easement. According to plaintiffs, the purpose of that section of the consent order was to establish an easement by which plaintiffs can launch and retrieve boats, and therefore it is in fatal conflict with the fifteen-foot-width provision contained therein. The plaintiffs argue that, in such a case of conflict, the express purpose of the Launching and Retrieval Easement prevails over its dimensions. The defendants disagree, maintaining that there is no conflict and that the consent order is unambiguous as to the width of the easement.

The plaintiffs are correct in their assertion that the intent of the parties must control if the purpose of the agreement is clear from its terms. *See Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010); *W.P. Associates*, 637 A.2d at 356; *Hill v. M.S. Alper & Son, Inc.*, 106 R.I. 38, 47, 256 A.2d 10, 15 (1969). Where plaintiffs go astray, however, is in their assertion that the intent of the parties in agreeing to the terms of the consent order was for plaintiffs to have the ability to launch and retrieve boats. The clear and unequivocal purpose of the consent order was to resolve all disputes between the parties arising out of any purported easement rights. The creation of the Launching and Retrieval Easement was but one term contained in that entire agreement. The purpose of the consent order was not, therefore, for plaintiffs to be able to launch and retrieve boats, and that is not the intent to which we are tasked with giving effect. To be sure, one dispute that was resolved in the parties' settlement agreement centered on their respective rights as to the Launching and Retrieval Easement. But it is our task to look to the

intent underlying the entire agreement, and not one isolated section of it. *See Colonial Penn Insurance Company v. Mendozzi*, 488 A.2d 734, 736 (R.I. 1985) ("[I]n [carrying out our primary task of] ascertaining the intent [of the parties], we must look at the instrument as a whole and not at some detached portion thereof." (quoting *Woonsocket Teachers' Guild, Local 951 v. School Committee of Woonsocket*, 117 R.I. 373, 376, 367 A.2d 203, 205 (1976))).

As further support for their purpose-trumps-conflicting-provision argument, plaintiffs rely on this Court's opinion in *Carpenter v. Hanslin*, 900 A.2d 1136 (R.I. 2006). However, that reliance is unavailing. In *Carpenter*, this Court adopted the trial justice's decision. *Carpenter,* 900 A.2d at 1141-42. The plaintiffs now point to that trial justice's ruling that "[i]ncidental and occasional use of property to the south of the right-of-way to accommodate the safe turning around of vehicles—but not parking, standing, loading or unloading—must be allowed." *Id.* at 1149. But we cannot simply isolate that quote to afford plaintiffs the relief they seek. The factual and procedural underpinnings of *Carpenter* are key, and they are markedly distinguishable from what occurred in the matter before us.

In *Carpenter*, over the course of a three-day bench trial, the parties sought declarations concerning a disputed right-of-way to a pond where the "grantor * * * did not have a correct understanding as to the location of his property boundary and the rights-of-way he established in reference to the boundary * * *." *Carpenter*, 900 A.2d at 1144, 1145. Not only that, but also the characteristics of the land itself had evolved since the original grant. *Id.* at 1145, 1146. It was clear to the trial justice that the grantor had intended for the grantees to enjoy vehicular access to the pond. *Id.* at 1145, 1148. Yet, whether because of the grantor's incorrect presumptions or the since-altered terrain, the trial justice found that it was not possible for vehicles to traverse the right-of-way. *Id.* at 1149. In permitting the grantees to access that part of the property that

would make such vehicular travel possible, the trial justice found it to be "only reasonable that the operators of such vehicles be allowed to safely turn around after passage on the right-of-way * * *." *Id.* Therefore, the trial justice allowed for "[i]ncidental and occasional use of property to the south of the right-of-way to accommodate the safe turning around of vehicles * * *." *Id.*

Here, on the other hand, we are not confronted with such a daunting task. The parties were able to forgo a similarly challenging trial by reaching a settlement. In fact, in approving the terms of the consent order, the first trial justice remarked:

> "First of all, my compliments to all of you and all of the attorneys that have worked diligently on crafting this resolution as well as all of you as family members and parties. I indicated to counsel after the first two days of trial in this matter that I felt that a solution could better be crafted by the parties than by the Court, not only because in ruling on a matter such as this there is risk to all of the parties that the decision I make may not be one that's acceptable but, furthermore, often in crafting a resolution, you can address issues in a way that go[es] beyond even what the Court is asked to do and resolve matters more fully and I believe, after reviewing the consent order, that that's exactly what has happened in this case."

It is for that very reason that we are reviewing the consent order as a contract, and not as an easement, which was the situation faced by the trial justice in *Carpenter*. The parties here reached an agreement to resolve their dispute; they, with counsel, walked the property and engaged in lengthy, intensive negotiations to craft a resolution that was acceptable to both plaintiffs and defendants. That resolution was memorialized in a writing that was particular and precise. The plaintiffs now seek to avoid the plain terms of the very agreement that they negotiated and willingly entered into by asking this Court to allow them to go beyond the specified fifteen-foot width of the Launching and Retrieval Easement, as the trial justice did in *Carpenter*. We will not do so. The consent order is a contract, and its terms with respect to the width of the easement are clear and unambiguous.

The plaintiffs also seem to argue that the consent order was infected by a latent ambiguity as to the width of the Launching and Retrieval Easement, and that it was not until after they entered into the consent order and then tried to tow their fourteen-foot boat on an even longer trailer, attached to an SUV, that they discovered the conflict between their ability to launch and retrieve boats and the specific fifteen-foot confines of the easement. In that sense, both parties cite to extrinsic evidence about the historical use of the easement, the types of boats and vehicles that had been used, and whether other methods of transporting a boat might be successful within the parameters of the right-of-way. Here, however, we give great weight to the finding of the trial justice that plaintiffs were aware at the time they agreed to the consent order that fifteen feet was an insufficient amount of space to execute a three-point turn but that they agreed to that limitation anyway, based on a presumption that they would be permitted to go beyond those parameters. The record does not support the notion that any ambiguity developed after entry of the consent order. Therefore, we need not delve into the wide world of boat-towing-versus-pushing, front-versus-rear-ball-hitch, and tractor-versus-truck hypotheticals raised by the parties. *See Botelho v. City of Pawtucket School Department*, 130 A.3d 172, 176-77 (R.I. 2016) ("[I]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." (quoting *JPL Livery Services, Inc. v. Rhode Island Department of Administration*, 88 A.3d 1134, 1142 (R.I. 2014))).

We are of the firm opinion that the section of the consent order that established the Launching and Retrieval Easement is clear and unambiguous. We thus have "no reason not to accept the [consent order] and apply it at face value." *Young*, 973 A.2d at 559. The width provision of the consent order is as clear as day: The easement shall be fifteen feet wide. In erecting a fence at that fifteen-foot boundary, *on their own property*, defendants were simply

asserting their own rights under the consent order. Perhaps that was a petty gesture—a classic "gotcha" maneuver, as plaintiffs see it. But the point remains: The agreement is clear and each side negotiated it with eyes wide open. *See Rivera v. Gagnon*, 847 A.2d 280, 285 (R.I. 2004) ("It is a basic tenet of contract law that the contracting parties can make as good a deal or as bad a deal as they see fit * * *." (quoting *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 703 (R.I. 1994))).

## 2

### The Post-and-Chain Device

The next disputed term, the "'post and chain' device * * * installed in or about 1988," is one plaintiffs themselves aptly refer to as a "minor issue." The plaintiffs argue that the post-and-chain device that was installed in 1988 included a courtesy gate to its side, enabling plaintiffs to simply walk around the post. Our *de novo* review of that section of the consent order, however, leads us to the very same conclusion that was reached by the trial justice. The consent order is plain and unambiguous as to its allowance of a specific post-and-chain device in a particular location. The so-called courtesy gate—in other words, space left open to the side of the post-and-chain device, not a feature of the device itself—may have existed in a previous arrangement, but the agreement at issue, specific as it may be, is simply silent as to that point. We cannot add that term to this contract. *See Young*, 973 A.2d at 559-60.

## 3

### The Dock Posts

Lastly, we reach the same conclusion with respect to the third disputed term, the dock posts. The consent order clearly and unambiguously lays out the process for the parties to follow and describes their respective duties in attempting to obtain CRMC approval to relocate the

Lighthouse dock. All that is mentioned in the agreement is the relocation of the floating dock itself; there is no reference whatsoever to tall, permanent dock posts that would be entrenched on shore. The plaintiffs have no one to fault but themselves for not including the dock posts in—or noticing they were missing from—the materials submitted to CRMC for approval. It was incumbent upon plaintiffs, if the posts were important to them, to at least demand their inclusion in the CRMC materials, if not in the consent order itself.

## C

### Attorneys' Fees

The defendants have cross-appealed from the trial justice's denial of their request for attorneys' fees. This Court "staunch[ly] adhere[s] to the 'American rule' that requires each litigant to pay its own attorney's fees absent statutory authority or contractual liability." *Danforth v. More*, 129 A.3d 63, 72 (R.I. 2016) (quoting *Shine v. Moreau*, 119 A.3d 1, 8 (R.I. 2015)). In arguing, then, for an award of attorneys' fees in their favor, defendants claim both statutory authority and contractual liability.

"[T]he issue of whether there exists a *basis* for awarding attorneys' fees generally is legal in nature, and therefore our review of such a ruling is *de novo*." *Danforth*, 129 A.3d at 72 (quoting *Shine*, 119 A.3d at 8). "If it is determined that there is an adequate legal basis for such an award, then we review a trial justice's decision awarding or denying attorneys' fees for an abuse of discretion." *Id.*

Certainly, G.L. 1956 § 9-1-45 might provide a basis for awarding attorneys' fees in this case. That statute provides, in relevant part, that "[t]he court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court * * * [f]inds that there was a complete absence of a justiciable issue of either law or fact raised

by the losing party[.]" Section 9-1-45(1). The defendants did prevail in a civil action arising from a breach of contract; the trial justice thus had statutory authority to award attorneys' fees to defendants if, within her considerable discretion, she determined that they were warranted.[10] However, she made no such award. We review that denial for an abuse of discretion, "remain[ing] mindful that the decision to grant or deny attorney's fees is vested within the sound discretion of the trial justice." *Danforth*, 129 A.3d at 72.

"In light of [that] discretion[,] * * * we need not loiter long over this assignment of error." *Danforth*, 129 A.3d at 72. The trial justice noted that the plaintiffs had conducted themselves the same way from 1978 until 2010: "[H]e would take the boat, attach the boat trailer to his car, travel down this right-of-way to the water, conduct a three-point turn, * * * put the boat in the water, and then haul it out." In that sense, the trial justice observed, "[W]hy wouldn't he have expected that he would[] be able to continue that? And now there[] [are] fences." Therefore, the trial justice found that, even though the plaintiffs did not prevail, there was a justiciable issue, and she denied the defendants an award of attorneys' fees. We can see no abuse of discretion in the trial justice's ruling, and thus decline to disturb it.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.

---

[10] The defendants also argue that the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9, provides a statutory basis for such an award, but this Court has never once held that "costs" under § 9-30-10 include attorneys' fees. And finally, defendants argue that, because the trial justice found plaintiffs to be in breach of the contract, § 18 of the consent order is a source of contractual liability that provides a basis for awarding attorneys' fees. We have even graver reservations about whether the "sanctions" contemplated by the consent order encompass attorneys' fees. Nonetheless, we give great deference to the trial justice's ultimate decision to deny defendants fees in this case, and we discern no abuse of discretion.

# Appendix



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | James H. Arnold et al. v. Thomas L. Arnold, Jr., individually and in his capacity as Trustee of the Thomas L. Arnold, Jr. Trust, et al. |
| **Case Number** | No. 2016-12-Appeal. No. 2016-145-Appeal. (WC 12-379) |
| **Date Opinion Filed** | June 22, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Kelly M. Fracassa, Esq. |
| | For Defendants:<br><br>William R. Landry, Esq.<br>Joseph V. Cavanagh, Esq. |