**Supreme Court**

No. 2015-94-Appeal.
No. 2015-127-Appeal.
(PC 11-6528)

Sophie F. Danforth          :

v.          :

Timothy T. More et al.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2015-94-Appeal.
No. 2015-127-Appeal.
(PC 11-6528)

Sophie F. Danforth             :

v.                             :

Timothy T. More et al.         :

Present:  Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.** These consolidated cases came before the Supreme Court on cross-appeals from an order of the Superior Court granting summary judgment in favor of the plaintiff, Sophie F. Danforth (plaintiff or Danforth).  On appeal, the defendant, Timothy T. More (defendant or More), contends that the hearing justice erred in (1) granting summary judgment in favor of the plaintiff; and (2) awarding statutory prejudgment interest.  In her cross-appeal, the plaintiff asserts that the hearing justice improperly denied her request for attorney's fees.  On December 10, 2015, this case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided.  After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown.  Accordingly, we shall decide the appeal at this time without further briefing or argument.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On March 22, 2011, Danforth entered into a purchase and sales agreement (PSA) with More and his wife, Rebecca (the Mores), pursuant to which she agreed to sell, and the Mores agreed to purchase, certain real estate (the property) located at 10 Lloyd Lane in Providence. The PSA provided that the sale price of the property would be $700,000, of which $30,000 would be paid as a deposit at the time the PSA was executed. This deposit was to be paid to Andrew Davis, Esq. (Davis) as attorney and escrow agent for Danforth. The PSA set a closing date for October 15, 2011, but also provided that the Mores "may elect to close on any business day on or after September 1, 2011, and before October 15, 2011[.]"

The PSA provided as a condition to its performance:

> "The [Mores] may, at [their] expense, have the [property] inspected for radon, lead paint, physical condition, termites, rodents and other pests, which inspection shall be satisfactory to the [Mores] in all respects. If any of the foregoing inspections are not satisfactory to the [Mores] for any reason, the [Mores] may elect to notify [Danforth] in writing of the unsatisfactory condition on or before 3:00 p.m. on April 4, 2011 ('Inspection Contingency Date') and terminate this Agreement. In the event [the Mores] elect[] to terminate this Agreement in accordance with this [section], this Agreement shall be deemed null and void and the Deposit shall be returned to the [Mores], and the parties will have no further obligations to each other."

Importantly, the PSA further provided that "[t]he parties hereto acknowledge and agree that * * * [t]ime is of the [e]ssence for purposes of the Inspection Contingency Date" and that, if the Mores found an unsatisfactory condition prior to the inspection contingency date, their sole remedy would be to terminate the PSA. However, if the Mores failed to invoke their right to terminate the PSA prior to the inspection contingency date and thereafter defaulted on their obligations, the PSA provided that "[Danforth] shall have the right to retain the Deposit for [her] own use, which right shall be [her] sole remedy for such default."

The inspection contingency date set for April 4, 2011, came and went with no notification from the Mores that they intended to exercise their right to terminate the PSA. On April 7, 2011, the house was inspected; and, following the inspection, More sent Danforth an email, stating: "I spent over an hour with the house inspector this morning. * * * There are some things that need to be fixed or replaced * * * but nothing beyond what might be expected. I will email you a copy of the report when I receive it. Certainly nothing that would cause us to terminate the contract." Thereafter, More sent a series of emails to Davis, in which he indicated that the Mores still intended to go forward with the closing. On April 12, 2011, More sent an email stating: "The inspection report attached shows two items that [Danforth] might want to address: the termites in an area of the crawl space and a wood column in the crawl space that has been compressed because it is carrying too much weight. Otherwise nothing too serious. * * * We are tentatively looking at a closing date of September 7." An email sent on April 15, 2011, provided: "We went to [the property] this morning to do some measuring. It appears that someone tried to break in the front door. * * * It does not appear that the structural integrity of the door was compromised but the surface of the door is cracked around the door handle."

Apparently, the Mores were planning to sell their current house and use the proceeds to purchase the property. However, their plan was complicated when their "prospective buyers got cold feet[,]" forcing them to place their house back on the market. As a result of this complication, More contacted Davis on April 28, 2011, stating, "This may mean that we will not want to close on September 7." Another email followed from More on July 18, 2011, in which he stated: "Query – did you do anything about the termites in the ceiling of the crawl space? We have no prospects for our house and will need a mortgage to buy yours. Someone just told me that we may not be able to get financing if there are termites."

A series of email correspondence followed, in which More and Davis discussed a potential closing date. On August 3, 2011, in response to Davis's request for a closing date, More indicated, "In the absence of a buyer we are looking at October 15." Thereafter, More contacted Davis again on September 12, 2011, this time requesting an extension of the closing date to December 1, 2011, because the Mores were having difficulty selling their home. Davis responded on September 14, 2011, indicating that, in order to extend the closing date, Danforth would require an increased deposit and an upward adjustment of the purchase price. In this email, Davis reminded More that "'time is of the essence' with respect to the purchase agreement." Although the closing was scheduled for October 17, 2011,[1] the Mores failed to appear at it. On October 18, 2011, Davis informed the Mores that they were in default pursuant to the terms of the PSA. More responded requesting a reduction in the purchase price and an extension of the period of time to close, which Danforth subsequently declined.[2]

On November 14, 2011, Danforth filed a complaint in Providence County Superior Court, which was subsequently amended on December 5, 2011. In her amended complaint, Danforth alleged breach of contract (count 1), requesting that she be allowed to retain the Mores' deposit in the amount of $30,000. In addition, she sought declaratory relief (count 2), asking the court to "construe the terms of the [PSA] and to order Attorney Davis, the escrow agent, to disburse the [deposit] to Ms. Danforth." Finally, the amended complaint also asserted a request

---

[1] From an email exchange between More and Davis, it can be gleaned that October 17, 2011, would be the latest date on which the closing was scheduled to occur. Specifically, Davis sent an email to More indicating that he would like to schedule the closing for October 14, 2011. In reply, More indicated that his "preference is to close Monday [October 17, 2011,] * * * just to give us another day to make sure the paper work is in place." There is no evidence that the closing was extended beyond this date.

[2] The property was later sold to a third party in December 2011 for $ 670,000.

for attorney's fees (count 3), because—according to Danforth—the Mores were defending the action "in the complete absence of any justiciable issue of either law or fact."

On December 19, 2011, the Mores filed an answer, in which they claimed that they "had no obligation to purchase the [property] because of [Danforth]'s failure to repair termite damage and vandalism damage that occurred after the inspection date and the closing date specified in the [PSA] and further assert[ed] that [Danforth] did not tender performance on the closing date." In addition, the Mores asserted as a counterclaim that More advised Danforth by an email sent on April 7, 2011, that her "'immediate attention' was required for termites" and that this matter "needed to be fixed or repaired." The Mores further asserted that, after executing the PSA, the front door had been damaged during an attempted break-in. The Mores claimed that this damage to the property resulted in a breach to the contract because—in their view—the PSA required the property to be delivered in the same condition that it was in when the PSA was executed.

In due course, Danforth filed a motion for summary judgment, to which the Mores filed a written objection.[3] At the hearing on the motion for summary judgment, the hearing justice determined that the PSA required termination by April 4, 2011, and not only did the Mores fail to terminate the PSA by that date, but they "never attempted to use the termite issue or the door issue as a reason to cease their obligations under the [PSA]." Accordingly, the hearing justice granted Danforth's motion for summary judgment. Additionally, the hearing justice went on to consider Danforth's request for attorney's fees and concluded that, although he did not find merit in the Mores' argument, "the issue of termites and the issue of the door was something that was

---

[3] Timothy More, acting pro se and serving as his wife's attorney, did not appear for the hearing on the motion for summary judgment. After noting that the court did have the benefit of More's written objection and memorandum, the hearing justice considered the motion in his absence.

- 5 -

raised through e-mail, although not as a reason to terminate. * * * But it was an issue that was ongoing[.]" Accordingly, he denied Danforth's request for attorney's fees.

On January 18, 2013, the hearing justice entered an order granting Danforth's motion for summary judgment on counts 1 and 2 of her complaint and on the Mores' counterclaim. The order stated that Danforth was entitled to retain the $30,000 deposit, awarded prejudgment interest on that amount, and denied Danforth's request for attorney's fees. On February 6, 2013, Danforth filed a motion for entry of final judgment, to which the Mores objected. At the hearing on this motion, the parties disputed whether prejudgment interest was applicable and requested clarification as to the time period for calculating prejudgment interest. On March 1, 2013, the hearing justice entered judgment in favor of Danforth, which order stated that the applicable time period for calculating prejudgment interest was from October 17, 2011 (the date of the scheduled closing) until January 28, 2013 (the date that More authorized Davis to release the deposit to Danforth). Both parties timely appealed; in particular, Danforth appealed the denial of attorney's fees, and More appealed[4] the grant of summary judgment and award of prejudgment interest.

## II

### Standard of Review

In reviewing the granting of a motion for summary judgment, this Court engages in a de novo review, "apply[ing] the same standards and rules as did the motion justice." Narragansett Indian Tribe v. State, 81 A.3d 1106, 1109 (R.I. 2014) (quoting Beauregard v. Gouin, 66 A.3d 489, 493 (R.I. 2013)). In so doing, "[w]e view the evidence in the light most favorable to the nonmoving party." Id. We will affirm a hearing justice's grant of a motion for summary judgment "if there exists no genuine issue of material fact and the moving party is entitled to

---

[4] Notably, Timothy More is the only defendant that has pursued the appeal currently before us.

- 6 -

judgment as a matter of law." Takian v. Rafaelian, 53 A.3d 964, 970 (R.I. 2012) (quoting Classic Entertainment & Sports, Inc. v. Pemberton, 988 A.2d 847, 849 (R.I. 2010)). "The nonmoving party bears the burden of showing the existence of disputed issues of material fact by competent evidence; it cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." Id. at 971 (quoting Zanni v. Voccola, 13 A.3d 1068, 1071 (R.I. 2011)).

## III

## Discussion

On appeal, each party has dug its trenches and lobbed various arguments across the battlegrounds. More mounts a two-pronged attack. First, he argues that the hearing justice erred in granting Danforth's motion for summary judgment because there was a genuine issue of material fact "as to whether the [property] was in the same condition on the closing date as it was on the date the [PSA] was executed." Second, More asserts that the hearing justice erred in awarding Danforth prejudgment interest because the deposit was in the physical possession of Danforth's attorney during the period for which interest was awarded and—according to More— the suit was not a suit for pecuniary damages as required by G.L. 1956 § 9-21-10. In her counter attack, Danforth argues that the hearing justice wrongfully declined her request for attorney's fees because the Mores "raised no justiciable issue of law or fact to the claims asserted by [Danforth]." We consider each of these arguments in turn.

## A

## Summary Judgment

Our inquiry starts with the propriety of the hearing justice's grant of Danforth's motion for summary judgment. More points to a single issue of material fact which he contends should have precluded the grant of Danforth's motion. Specifically, he cites to evidence of the presence

of termites and vandalism related to an attempted break-in and contends that a material fact existed as to whether the property was in the same condition on the date of the closing as it was on the date that the PSA was executed.

"It has long been established that when concurrent acts are to be performed by the parties to a contract, the party bringing suit for breach need only aver that he or she was ready and willing to perform and that the alleged breacher was requested to perform but refused." Kottis v. Cerilli, 612 A.2d 661, 663-64 (R.I. 1992). "When the party alleging the breach demands the other's performance of the concurrent act, an offer to perform on the part of the alleging party is implied and understood." Id. at 664. It is not necessary that the party alleging the breach actually perform; instead, "notice of his or her readiness to perform constitutes and implies tender." Id.

In the case at hand, the email correspondence between More and Davis make clear that Danforth was ready and willing to perform on the closing date, but that the Mores were not. Specifically, on September 12, 2011, More sent Davis an email indicating that he was having difficulty selling their current house and requested an extension of the closing date to December 1, 2011. After negotiations regarding an extension of the closing date turned out to be fruitless, the parties settled on a closing date of October 17, 2011. On October 18, 2011, after the Mores failed to appear at the closing, Davis sent More an email notifying him that they were in default pursuant to the terms of the PSA. Based on this email correspondence, we conclude that Danforth's act of attending the closing constituted sufficient tender of performance and can support her contract claim.

Nevertheless, More claims that a genuine issue of material fact existed as to whether the presence of termites and the damaged front door rendered Danforth in breach of the PSA. In

support of this contention, More points to the following "Conditions of Premises" provision of the PSA:

> "Possession of the [property], free of all tenants, shall be delivered by [Danforth] to the [Mores] at Closing and the [property] shall be then in the same condition in which they are now, reasonable use and wear of the Fixtures and buildings thereon and of any Personal Property and damage by fire and other unavoidable casualty excepted. OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE BUYER AGREES THAT HE HAS INSPECTED THE PREMISES, FIXTURES AND PERSONAL PROPERTY, AND HE IS PURCHASING THE SAME 'AS IS' * * *."

More claims that the presence of the aforementioned defects prevented Danforth from delivering the property in the same condition that it was in at the time that the PSA was executed. We consider each of these alleged maladies separately.

Turning first to the alleged damage to the front door resulting from the presumed attempted break-in, we note that this "Conditions of Premises" provision, by its very terms, offers no recourse to More. While the provision required the property to be delivered in the same condition that it was in when the PSA was executed, it also provided that "damage by fire and other unavoidable casualty [was] excepted." (Emphasis added.) Here, the Mores provided no evidence to suggest that the damage from the attempted break-in was somehow avoidable. Instead, damage from an attempted break-in falls squarely within the classification of "other unavoidable casualty." Accordingly, the presence of damage to the front door did not present a genuine issue of material fact to preclude summary judgment.

We next turn our inquiry to the alleged presence of termites. Despite More's assertion to the contrary, the "Conditions of Premises" provision also offers no recourse to him with regard to any potential termite damage; instead, the PSA provided a separate escape hatch for the Mores: if they found the property to have any unsatisfactory condition by the inspection contingency date, they could—upon notification to Danforth—treat the PSA as null and void.

Indeed, the PSA specifically provided that "[t]he [Mores] may, at [their] expense, have the [property] inspected for * * * termites" and elect to terminate the agreement if the inspection is "not satisfactory to the [Mores] for any reason." To invoke this provision, the PSA required that the Mores notify Danforth in writing by April 4, 2011, the inspection contingency date. The PSA further provided that time was of the essence with respect to the inspection contingency date and that the Mores' right to terminate the PSA was their sole remedy under the section. However, the Mores neglected to have the property inspected until April 7, 2011. While this inspection ultimately exposed the presence of termites, their right to terminate the contract due to termite damage had already expired, as they had neglected to inspect the property and notify Danforth of the damage prior to the inspection contingency date.[5] By failing to avail themselves of the opportunity presented in the PSA to inspect for termite damage, the Mores relinquished any right to base a claim on such damage. Thus, the alleged presence of termites also did not preclude summary judgment.

Accordingly, we hold that the hearing justice did not err in granting summary judgment in favor of Danforth.

**B**

**Prejudgment Interest**

Having determined that summary judgment was appropriate, our inquiry now turns to whether prejudgment interest on the coveted deposit was properly awarded. More asserts that prejudgment interest should not have been awarded because the Mores received no benefit from the deposit during the period for which prejudgment interest was awarded, as they did not have access to it. In support of this contention, he argues that the deposit was in the physical

---

[5] In addition, we note that, even after the discovery of the termites, the Mores indicated that they were willing to proceed with the sale despite the defect.

- 10 -

possession of Danforth's escrow agent and opines that he was under no obligation to sign the release requested by Danforth. Alternatively, More contends that prejudgment interest is inappropriate in this case because—according to More—the case at hand is either a declaratory judgment action or is otherwise equitable in nature and not a suit for pecuniary damages, as required by § 9-21-10(a). Danforth responds that prejudgment interest was appropriate because summary judgment was awarded on the breach of contract count in addition to the declaratory judgment count.

The prejudgment interest statute, § 9-21-10(a), provides, in relevant part: "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein." Particularly pertinent to the case at hand, our case law has created various dividing lines with regard to whether a certain claim constitutes "pecuniary damages" within the meaning of § 9-21-10(a). We consider two of these distinctions as they relate to the case before us.

First, we have recognized that "[t]he return of a deposit is simply a reimbursement rather than an award of pecuniary damages, and thus the [prevailing party is] not entitled to the addition of statutory interest." Andrews v. Plouff, 66 A.3d 840, 843 (R.I. 2013) (quoting Bogosian v. Bederman, 823 A.2d 1117, 1121 (R.I. 2003)). In creating this distinction, however, we were careful to note that "our holding [did] not preclude every plaintiff from recovering prejudgment interest whenever a deposit is at issue. For example, if a plaintiff were awarded damages in a breach of contract case involving a deposit, then that plaintiff might well be entitled to statutory interest under * * * § 9-21-10(a)." Andrews, 66 A.3d at 843 n.2. The case before us

- 11 -

unquestionably does not involve the return of a deposit, but, instead, involves the retention of a deposit as a form of damages, as this was Danforth's sole remedial measure under the PSA. Thus, the mere fact that a deposit was involved does not preclude Danforth from recovering statutory interest.

Second, in another context, we held that "[a] determination of benefits, by way of a declaratory judgment, was not an award of damages[,]" and, therefore, the prevailing party in such a case "is not entitled to prejudgment interest." Fravala v. City of Cranston ex rel. Baron, 996 A.2d 696, 708 (R.I. 2010). More argues that the suit before us was declaratory in nature and, therefore, prejudgment interest cannot be awarded. However, Danforth's complaint included both a breach of contract claim and an action for declaratory judgment. In ruling on Danforth's summary judgment motion, the hearing justice specifically found that the Mores did not comply with the terms of the PSA. Accordingly, because there was a breach of contract claim before the hearing justice and the Mores were found to have breached the terms of the PSA, prejudgment interest was appropriately awarded. See Turacova v. DeThomas, 45 A.3d 509, 517 (R.I. 2012).

In his final attack, More asserts that prejudgment interest would be improper because Danforth's escrow agent was in physical possession of the deposit and he was under no obligation to sign a release to allow it to be turned over to Danforth. He suggests that prejudgment interest should not be awarded because the Mores were not in possession of the deposit and, thus, received no benefit from it. While More's argument is admittedly creative, it must fail. This Court has consistently recognized that imposition of prejudgment interest pursuant to Rhode Island's prejudgment interest statute "is a ministerial act which does not allow for any discretion by the judge or the jury." King v. Huntress, Inc., 94 A.3d 467, 499-500 (R.I.

- 12 -

2014). Further, we have stated that "[t]he dual purpose of prejudgment interest is to encourage early settlement of claims and to compensate an injured plaintiff for delay in receiving compensation to which he or she may be entitled." Oden v. Schwartz, 71 A.3d 438, 457 (R.I. 2013) (quoting Metropolitan Property & Casualty Insurance Co. v. Barry, 892 A.2d 915, 919 (R.I. 2006)). More's position places the shoe on the wrong foot: The focus of prejudgment interest is not on a defendant's ability to benefit from the money, but, rather, on the plaintiff's delay in receiving compensation. See id. During the time in which the deposit remained in Davis's account as Danforth's escrow agent—that is, until the Mores executed written releases—Danforth did not have access to the compensation to which she was entitled. Under such circumstances, prejudgment interest was appropriately awarded. Accordingly, we conclude that the trial justice did not err in awarding prejudgment interest to Danforth pursuant to § 9-21-10(a).

## C

### Attorney's Fees

We turn now to Danforth's contention that attorney's fees were improperly denied. Danforth contends that she is entitled to attorney's fees because the Mores breached the PSA when they failed to close on the scheduled closing date and because the Mores had no legal or factual justification for contesting such breach.

This Court has "staunch[ly] adhere[d] to the 'American rule' that requires each litigant to pay its own attorney's fees absent statutory authority or contractual liability." Shine v. Moreau, 119 A.3d 1, 8 (R.I. 2015) (quoting Moore v. Ballard, 914 A.2d 487, 489 (R.I. 2007)). However, in certain circumstances, the Legislature has determined that attorney's fees should be available to the prevailing litigant. One such circumstance is provided in G.L. 1956 § 9-1-45(1), which provides that a trial justice may award reasonable attorney's fees to a prevailing party "in any

civil action arising from a breach of contract in which the court * * * [f]inds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party[.]"

We have recognized that "[t]he issue of whether there exists a <u>basis</u> for awarding attorneys' fees generally is legal in nature, and therefore our review of such a ruling is <u>de novo</u>." <u>Shine</u>, 119 A.3d at 8 (quoting <u>Blue Cross & Blue Shield of Rhode Island v. Najarian</u>, 911 A.2d 706, 709 (R.I. 2006)). If it is determined that there is an adequate legal basis for such an award, then we review a trial justice's decision awarding or denying attorneys' fees for an abuse of discretion. <u>Id.</u> The parties do not dispute that § 9-1-45 provides an adequate basis for an award of attorney's fees; thus, we review the trial justice's decision denying such fees under an abuse of discretion rubric. In so doing, we remain mindful that the decision to grant or deny attorney's fees is vested within the sound discretion of the trial justice. <u>See</u> <u>Greensleeves, Inc. v. Smiley</u>, 754 A.2d 102, 103 (R.I. 2000) (mem.); <u>Bucci v. Anthony</u>, 667 A.2d 1254, 1256 (R.I. 1995).

In light of the discretion due to the hearing justice, we need not loiter long over this assignment of error. He determined that the termite problem and damage to the door presented justiciable issues, even though he ultimately concluded that More's arguments in that regard were meritless. We agree, and so cannot conclude that the hearing justice's determination was an abuse of his considerable discretion. Accordingly, we perceive no error in the hearing justice's denial of attorneys' fees.

## IV

### Conclusion

For the reasons set forth above, we affirm the Superior Court's judgment in all respects. The materials associated with this case may be remanded to that tribunal.

Chief Justice Suttell did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        Sophie F. Danforth v. Timothy T. More et al.

**CASE NO:**        No. 2015-94-Appeal.
No. 2015-127-Appeal.
(PC 11-6528)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    January 14, 2016

**JUSTICES:**        Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Luis M. Matos

**ATTORNEYS ON APPEAL:**

For Plaintiff:   David E. Maglio, Esq.

For Defendant:  Timothy J. More, Pro Se