February 25, 2025

**Supreme Court**

No. 2023-311-Appeal.
(PC 20-3773)

Americo Mallozzi aka Americo　　:
  Mallozzi & Associates

v.　　　　　　　:

Warwick Wings, LLC.　　　:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Americo Mallozzi aka Americo     :
    Mallozzi & Associates

v.                :

Warwick Wings, LLC.     :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Warwick Wings, LLC,

appeals from a Superior Court judgment in favor of the plaintiff, Americo Mallozzi

aka Americo Mallozzi & Associates. This case came before the Supreme Court

pursuant to an order directing the parties to appear and show cause why the issues

raised in this appeal should not be summarily decided. After considering the parties'

written and oral submissions and reviewing the record, we conclude that cause has

not been shown and that this case may be decided without further briefing or

argument. For the reasons set forth herein, we affirm the judgment of the Superior

Court.

# I

# Facts and Travel

Warwick Wings, LLC (Warwick Wings or defendant), is a Rhode Island limited liability company with the fictitious name of Hooters of Warwick. Hooters of Warwick is a restaurant belonging to the Hooters of America franchise. In 2015, Hooters of Warwick closed due to snow and ice damage that extended to the roof and the underlying trusses. Odeh Engineers, Inc. (Odeh), a structural engineering firm, was hired by defendant to evaluate the damage. Odeh met with the City of Warwick building inspector, Alfred DeCorte (the building inspector), and with Americo Mallozzi (plaintiff). Soon thereafter, Odeh issued a report to defendant, concluding that the roof trusses could not be repaired in place and would need to be fully rebuilt, which would require a full removal of the old roof and the installation of a new roof.

In June 2015, defendant's landlord engaged Nadeau Corporation (Nadeau), a construction management firm, to provide an estimate of the costs to repair the building and review the work to be completed. Nadeau estimated the repair costs to be around $1,250,000. The defendant sent a letter to the building inspector noting the findings of the structural engineers. The building inspector replied that, based on his own knowledge and experience, he agreed with Odeh that the trusses could not be repaired in place and would require a full removal and rebuild. Based on the

reports of Odeh and Nadeau as well as the agreement of the building inspector, defendant sent notice to its insurance provider, Liberty Mutual Insurance Company (Liberty). In this notice, defendant indicated that it would like to begin demolition work "as quickly as possible." Liberty, however, conducted its own inspection of the building. Liberty deemed that the trusses could be repaired in place and that the project would not require the full removal of the roof and the full rebuild of the trusses.

Meanwhile, defendant entered into a contract in October 2015 with plaintiff to provide architectural plans for the repairs based on Odeh's and Nadeau's reports. This contract provided that plaintiff's fees for his architectural services would be 11 percent of the final construction cost, or $137,500 based on Nadeau's estimated repair cost of $1,250,000. This fee was referred to in the contract as a "fix[ed] lump sum fee" which would be "11% of the final construction cost." According to the contract, the fee was to be paid in "progress payments" payable during various stages of the design and construction of the project: 15 percent for the schematic design phase, 20 percent for the design development phase, 40 percent for the contract documents phase, 5 percent for the bidding phase, and the remaining 20 percent for the construction phase. Significantly, the contract provided that the fee was "based upon the agreed to scope of work of the project" and acknowledged that the fee "may increase or decrease depending on the final cost."

Between January 2016 and April 2016, plaintiff completed and delivered several sets of architectural plans to defendant. In April 2016, plaintiff completed the final plans for the bidding phase and delivered them to defendant. The following month, plaintiff sought payment for the first four phases, stating that the total amount due at that time was $110,000. By November 2016, defendant had rendered two payments to plaintiff, totaling only $46,848.55. The defendant thereafter remitted no further payments to plaintiff. The plaintiff continued to send invoices and payment reminders to defendant. The defendant contends that it terminated the contract with plaintiff in a phone call in December 2018, although there is no record of this alleged termination.

Meanwhile, in February 2017, defendant filed an action against Liberty concerning the scope of the work necessary to repair the building. The case was filed in Kent County Superior Court but removed to the United States District Court for the District of Rhode Island. The defendant used the architectural plans prepared by plaintiff in the litigation against Liberty. Liberty used engineering reports and estimates generated by its own engineers in rebuttal. According to Phillip Moran, the CEO of Attila Wings, LLC, a consulting company that Warwick Wings had hired to facilitate operations, defendant and Liberty engaged in an appraisal process as part of the federal litigation. Mr. Moran testified that the judge accepted the result

- 4 -

of the appraisal and ruled that the cost to rehabilitate the building was $450,000.[1]

The parties ultimately agreed to settle for $785,000, which figure, according to Mr. Moran, included lost business income.

The parties disagree as to whether this settlement agreement included the fees to be paid to plaintiff. The plaintiff's full contract fees for 80 percent completion, or $110,000, were, however, included in the proof-of-loss statement that defendant submitted to Liberty prior to reaching a settlement. According to Mr. Moran, the difference between the $785,000 settlement and the $453,000 cost to repair the building is attributable to lost business income during the four years that the restaurant was closed. What is clear, however, is that Liberty issued the full settlement payment to defendant in May 2019, but defendant made no further payments to plaintiff beyond the $46,848.55 it had paid three years earlier, in November 2016.

Based on the appraisal and settlement in the case against Liberty, defendant moved forward with construction plans on the revised assumption that the roof could now be repaired in place. The building inspector also approved the new plans. Daniel Wooden, vice president of operations for Attila Wings and an owner of Warwick Wings, testified that plaintiff was notified in a telephone call that his

---

[1] In his testimony, Mr. Moran referred to the appraisal figure alternately as $450,000 and $453,000. It would appear that the actual figure was $453,258.45.

services were being terminated. Thereupon, defendant hired another architect who drew up a completely new set of plans.

Finally, in May 2020, after receiving no additional payments or updates from defendant, plaintiff filed suit against defendant in Providence County Superior Court, seeking $63,149.63 in damages, or the remaining amount allegedly due under the contract through the bidding phase. In the meantime, defendant moved forward with the construction plans prepared by the new architect and rehabilitated the building for the total price of "$453,000."

In his complaint, plaintiff alleged one count of breach of contract and one count of unjust enrichment. In its answer, defendant denied both counts, asserted five affirmative defenses, and counterclaimed for unjust enrichment. The parties waived a jury trial, and a justice of the Superior Court presided over a one-day bench trial. Three witnesses testified at the trial: Daniel Wooden; Phillip Moran; and plaintiff.

Mr. Wooden testified that Attila Wings was a consulting company that was hired by defendant to oversee the management of Warwick Wings and that he was familiar with the contract with plaintiff. He acknowledged that the contract referred to a lump-sum fee. However, Mr. Wooden believed the lump sum was to be based on the actual construction cost of the building as it was completed and not the budget for the original scope of work on which the contract with plaintiff was predicated.

He conceded on direct examination that he never terminated plaintiff in writing but said that he had nonetheless terminated plaintiff in a December 2018 phone call. He further testified that defendant never used the plans prepared by plaintiff because the scope of work for the project changed.

Mr. Moran testified that he was aware that Mr. Wooden had terminated plaintiff. Mr. Moran testified that, as a result of the suit with Liberty, he had "lost faith" in plaintiff's abilities to complete the plans and that they decided to terminate plaintiff. Additionally, he testified that he believed plaintiff had never completed the bidding phase or even the contract documents phase. He was also adamant that the difference between the final settlement amount and the final project cost was only for "lost business income."

After the conclusion of the testimony, the trial justice issued a written decision, finding for plaintiff on his breach-of-contract claim and dismissing both parties' claims for unjust enrichment. In his decision, the trial justice determined that Odeh had prepared an engineering report concluding that the trusses could not be repaired in place and that the building inspector had agreed with that conclusion. Furthermore, the trial justice reasoned that plaintiff premised his architectural bids on the engineering plans of Nadeau Corporation, which appeared to be consistent with the plans of Odeh Engineering, both of which called for the full replacement of the trusses. He further found that plaintiff relied on the "engineers' directives * * *

which required the installation of new roof trusses." The trial justice concluded that defendant was aware plaintiff was following the engineers' specifications and never told him to do otherwise. Nor did defendant ever ask plaintiff to retrofit the plans after the suit with Liberty. The trial justice additionally noted that he could not find that plaintiff's contract had ever been terminated.

The trial justice further found that the testimony of Mr. Wooden and Mr. Moran lacked credibility. He noted that it appeared that Mr. Wooden and Mr. Moran blamed plaintiff for the "engineering differences" and that their "grudge * * * skewed not only the weight of their testimony, but their perception of who * * * was to blame." Additionally, despite defendant's contentions, the trial justice reasoned that the settlement with Liberty "presumably" did include the bill for plaintiff.

Based on the copies of the architectural plans in the record that plaintiff had submitted to defendant in April 2016, the trial justice determined that plaintiff had completed 80 percent of the phases outlined in the contract: the schematic design phase, the design development phase, the contract documents phase, and the bidding phase. Even though, as the trial justice noted, the plans had not actually been used in the bidding process by defendant, the plans had nonetheless been completed through that phase. As such, the trial justice found that defendant had breached the contract with plaintiff and that there had been no cure.

The trial justice determined that the contract was indeed for a lump sum of $137,500 and that plaintiff should be entitled to damages in light of his completion of 80 percent of the contract. Therefore, the trial justice concluded that plaintiff was entitled to 80 percent of his total contract fee, or $110,000, minus the payments of $46,848.55 already rendered to him. Thus, he awarded plaintiff damages in the amount of $63,151.45.

On the issue of plaintiff's claim for unjust enrichment, the trial justice found that, because there was a binding and enforceable contract, unjust enrichment did not apply. The trial justice also denied defendant's counterclaim for unjust enrichment, finding that defendant materially breached the contract while plaintiff had proceeded in good faith. Finally, the trial justice ruled that attorneys' fees could not be determined until the end of litigation, and he gave the parties thirty days to file their motions and supporting documentation.

After the decision was issued, defendant filed a premature, but valid, notice of appeal. *See* Article I, Rule 4 of the Supreme Court Rules of Appellate Procedure. The plaintiff thereafter filed a motion for attorneys' fees with supporting documentation. After a hearing on the matter of attorneys' fees, the trial justice granted the motion and issued a judgment awarding plaintiff contract damages in the amount of $63,151.45 and attorneys' fees in the amount of $74,777.74.

## II

## Standard of Review

This Court has held "that the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Luis v. Gaugler*, 185 A.3d 497, 502 (R.I. 2018) (quoting *Fravala v. City of Cranston ex rel. Baron*, 996 A.2d 696, 704 (R.I. 2010)). Specifically, "[t]he existence of damages, including their certainty, is a question for the factfinder to decide." *Management Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1179 (R.I. 2019) (quoting *Fogarty v. Palumbo*, 163 A.3d 526, 537 (R.I. 2017)).

Additionally, "[t]he task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." *McEntee v. Davis*, 861 A.2d 459, 464 (R.I. 2004) (quoting *Bogosian v. Bederman*, 823 A.2d 1117, 1120 (R.I. 2003)). "A trial justice's findings on questions of law, however, are reviewed *de novo*." *Estrella v. Janney Montgomery Scott LLC*, 296 A.3d 97, 106 (R.I. 2023) (quoting *Town Houses at Bonnet Shores Condominium Association v. Langlois*, 45 A.3d 577, 581 (R.I. 2012)).

## III

## Discussion

## Contract Interpretation and Performance

On appeal, defendant raises six issues. Two of defendant's claims of error turn on the trial justice's interpretation of the contract and the parties' performance under the contract. First, defendant asserts that the trial justice erred in finding that the contract calls for a lump-sum fee rather than "a contingent fee." Specifically, defendant contends that the contract is ambiguous and should be interpreted to call for a fee that is "contingent upon the final construction cost." That contingency payment, defendant argues, should be based on the actual cost of repairing the roof as completed under the revised project design rather than on the estimated cost of construction as contemplated in its contract with plaintiff.

Because this argument relies on a determination that the contract is ambiguous, we address that threshold matter first. "The determination of whether a contract's terms are ambiguous is a question of law to be decided by the court." *JPL Livery Services, Inc. v. Rhode Island Department of Administration*, 88 A.3d 1134, 1142 (R.I. 2014). We review questions of law *de novo. Id.* A contractual term is ambiguous when it is "reasonably and clearly susceptible to more than one rational interpretation." *Miller v. Saunders*, 80 A.3d 44, 49 (R.I. 2013) (quoting *DiPaola v.*

*DiPaola*, 16 A.3d 571, 576 (R.I. 2011)). Conversely, "[w]hen there is only one reasonable interpretation of a contract, the contract is deemed unambiguous." *Roadepot, LLC v. Home Depot, U.S.A., Inc.*, 163 A.3d 513, 519 (R.I. 2017).

When determining whether a contract is ambiguous, we read the contract in its entirety and "give words their plain, ordinary, and usual meaning." *JPL Livery Services, Inc.*, 88 A.3d at 1142 (quoting *Furtado v. Goncalves*, 63 A.3d 533, 537 (R.I. 2013)). The contract between plaintiff and defendant states that the construction budget is "[b]ased on the preliminary budget of Nadeau Corporation in the amount of $1,250,000.00. This budget may be increased or decreased once the architectural and engineering plans and specifications are finalized. This is a starting point and good step to get this job going."

The contract then provides for plaintiff's fees:

> "Based on our present understanding[] of the project[,] [plaintiff] will charge the following fees to complete the scope of work described in this proposal. The Architectural and Engineering total fee will be 11% of the final construction cost. 11% of $1,250,000 equals $137,500 which may increase or decrease depending on the final cost."

It is clear from the contract language that plaintiff's fee as set forth in the contract, $137,500, was not a firm figure. Rather it was a percentage of the final construction cost of what was expected to be a $1,250,000 project. It is also clear, however, that

the scope of work contemplated in the contract documents called for the removal of the trusses and the installation of a new roof.

Notably, "a reviewing court should not seek out ambiguity where there is none." *Roadepot*, 163 A.3d at 519. Instead, a court should consider "whether the language has only one reasonable meaning when construed in an ordinary, common sense manner." *Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.*, 890 A.2d 58, 63 (R.I. 2005) (deletion and emphasis omitted) (quoting *Textron, Inc. v. Aetna Casualty and Surety Co.*, 638 A.2d 537, 541 (R.I. 1994)).

We think the contract terms here are quite clear. Although the final payment may fluctuate somewhat depending on the "final construction cost," the periodic "progress payments" are calculated as a percentage of the basic fee of $137,500. Additionally, the contract explicitly states that the contract fee is to be a "lump sum" payment. As the trial justice observed:

> "[T]he contract was for a fixed sum of $137,500, with payments to be made periodically, according to what work was completed. [The plaintiff] was to be paid a fixed sum for the entire project, a set lump sum, which will be paid in pre-established increments. * * * Hence, the value of the contract was $137,500, to be paid periodically."

Additionally, the contract refers to that fee as being based on the estimate by Nadeau and the specific architectural design plans drafted for the project for which that estimate was prepared. The "common sense" interpretation is that the payment was intended to be a sum equal to 11 percent of the construction cost for the project for

which plaintiff designed his architectural plans and for which this contract was drafted. It is illogical to suggest that the fee should be based on an entirely different scope of work completed with a different architect that was not contemplated by any of the parties at the time this contract was formed.

Having determined that the contract is not ambiguous, we turn to defendant's claim that the trial justice erred in determining that the fee was based on the estimated final construction cost in the contract. As we have previously explained, "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." *Botelho v. City of Pawtucket School Department*, 130 A.3d 172, 176-77 (R.I. 2016) (quoting *JPL Livery Services, Inc.*, 88 A.3d at 1142). The terms of the contract are not ambiguous, and, as such, this contract should be interpreted independent of facts arising from defendant's suit with Liberty and the changes to the scope of work that resulted from that suit. This is especially true given that the scope of work for the second project was not in the contemplation of the parties at the time the contract was formed. We are satisfied that the trial justice did not err in finding that the contract called for a lump-sum payment of 11 percent of $1,250,000, or $137,500.

Next, defendant claims that the trial justice erred in finding that defendant had not terminated plaintiff and that defendant had breached the contract. The defendant

implies that, if it had terminated plaintiff for cause, there would have been no breach. The defendant points to the fact that, at trial, both Mr. Wooden and Mr. Moran testified that plaintiff had in fact been terminated and that there was no testimony presented to the contrary. "[W]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *JPL Livery Services, Inc.*, 88 A.3d at 1142 (quoting *Cullen v. Tarini*, 15 A.3d 968, 976 (R.I. 2011)).

The trial justice found that Mr. Wooden's and Mr. Moran's testimony lacked credibility, especially on the point of their alleged termination of plaintiff. He found that Mr. Wooden was uncooperative when asked about plaintiff's termination and that Mr. Wooden purposefully derailed or distracted counsel in his questioning. The trial justice also noted that Mr. Moran appeared to be "clearly upset" with the plaintiff and "blamed [plaintiff] for the lower appraisal award" in the suit with Liberty. The trial justice reasoned that this grudge that the witnesses held against plaintiff impaired their credibility even further. Additionally, the trial justice noted that "it was odd for these businesspersons not to have any documentation and limited recollection of their key conversations" about terminating plaintiff. As a result, the trial justice found that defendant "fail[ed] to establish that the contract was unilaterally 'cancelled' but it also failed to show any cause" for the alleged termination. We cannot say that the trial justice was clearly erroneous in his

- 15 -

interpretation of the testimony presented or the weight he accredited to that testimony when he found there was no valid termination.

Additionally, and as the trial justice noted, even if plaintiff had been terminated, this does not mean that plaintiff's termination was justified. The only rationale Mr. Wooden and Mr. Moran gave for allegedly firing plaintiff was that they no longer trusted him after the suit with Liberty. But the trial justice found, based on the evidence presented to him, that it was "reasonable for the architect to follow the engineers' directives and [it] may have been negligent if [he] failed to do so." The plaintiff prepared the plans as he was directed according to the contract and delivered them to defendant in April 2016. The defendant then ceased making payments. As such, the trial justice found that defendant "simply ignored its contract and the bill."

Accordingly, we perceive no error in the trial justice's ruling that defendant breached the contract, thereby entitling plaintiff to an award of contract damages.

### Damages

The defendant's next three claims of error turn on disputes that affect the determination of the amount of damages. First, defendant claims that the trial justice erred in finding that plaintiff had proven damages with any reasonable certainty. The defendant argues that there was no testimony demonstrating that plaintiff was entitled to further payments under the contract and no way to determine the amount

of damages without evidence of the final construction cost. Additionally, defendant claims that the trial justice erred in finding that the appropriate measure of damages was a percentage of the estimated value of plaintiff's performance under the contract.

"It is well settled that a court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract." *Management Capital, L.L.C.*, 209 A.3d at 1179 (quoting *Sophie F. Bronowiski Mulligan Irrevocable Trust v. Bridges*, 44 A.3d 116, 120 (R.I. 2012)). "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty." *Id.* (deletion omitted) (quoting *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 273 (R.I. 2002)). However, "[t]he existence of damages, including their certainty, is a question for the factfinder to decide." *Id.* (quoting *Fogarty*, 163 A.3d at 537).

Here, the trial justice determined that, to place plaintiff in as good a position as if he had fully performed, the measure of damages should be based on the contract's value to plaintiff as contemplated under the contract. The trial justice found that plaintiff had completed all the phases denoted in the contract except for the last phase and that in doing so, plaintiff had completed work equal to 80 percent of the contract value. The payment schedule within the contract assigned percentages of the total fee to be paid at certain intervals that corresponded with

phases of work completed by plaintiff. Finding that the measure of damages should be based on the work completed under this schedule and the corresponding percentages is logical and is based on the explicit and unambiguous payment schedule within the contract itself. Thus, finding that this was the appropriate measure of damages under the contract was within the sound fact-finding duty of the trial justice, and we cannot say there is any indication that he erred.

Next, defendant attacks the trial justice's determination of which phases under the contract were completed by plaintiff. Specifically, it claims the trial justice erred in finding plaintiff had completed the bidding phase. In support, defendant argues that both Mr. Wooden and Mr. Moran testified that only the first two phases in the contract were completed. Based on that testimony, defendant implies, plaintiff is entitled to only 35 percent of his total fee under the contract, which it had already paid.

"[W]e give deference to the inferences and conclusions drawn by the trial justice from the testimony and evidence presented." *Red Gate Motel, Inc. v. Albanese*, 317 A.3d 1123, 1126 (R.I. 2024). "When 'the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers * * *.'" *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015) (bracket omitted) (quoting *Reagan v. City of Newport*, 43 A.3d 33, 37 (R.I. 2012)).

The trial justice based his decision on the evidence presented to him, which included not only the testimony at trial but also the architectural plans completed by plaintiff. The plans to be used for bidding were completed and given to defendant in April 2016. Those plans are marked with both the date of completion and the wording "for bidding only." The defendant contends that, because defendant never used the plans for bidding purposes, plaintiff should not be paid for having completed them. At trial, Mr. Wooden agreed that he reviewed the April 2016 plans, but that defendant never proceeded with actually sending the plans out for bid. The fact that the plans were never actually used for bidding is of no consequence to determining that the plans for bidding were in fact completed. The trial justice did not err on this point.

In its final attack on the damages awarded, defendant claims that the trial justice erred in not taking judicial notice of the rulings in the case with Liberty and thus erred in not basing the measure of damages on the final construction cost of the project as completed rather than on the final construction cost noted in the contract. The defendant claims that doing so conflicts with the United States District Court's decision on the matter and implicates the doctrine of *res judicata*. Because defendant conflates two separate arguments on this point, we address them individually.

First, we address the issue of judicial notice of the appraisal award. "In Rhode Island, a court may take judicial notice of court records and, while not every document that may have been placed in a court file may properly be regarded as part of the record, we have demarcated examples of those that would be considered as such." *Doe v. Brown University*, 253 A.3d 389, 395 (R.I. 2021) (quoting *Goodrow v. Bank of America, N.A.*, 184 A.3d 1121, 1126 (R.I. 2018)). Although we have held that a trial justice may correctly consider filings in the federal courts as "official public records," *see Doe*, 253 A.3d at 395, they are merely evidence to be considered. Here, the trial justice explicitly stated at trial that he was taking judicial notice "of the document listed in Exhibit A," but that it would be "marked for identification only. They are not a full exhibit." "Exhibit A" purports to be Liberty's "motion to confirm the appraisal award," including an "Appraisal of Insurance Claim – Award Form" and an order of the United States District Court granting said motion to confirm. Although defendant initially requested to admit the exhibit in full, defendant voiced no objection after the trial justice's ruling to mark the exhibit "for identification only."

On appeal and in conclusory fashion, defendant argues that "[t]he trial court's failure to take judicial notice of specific factual findings within the [United States] District Court case was an abuse of discretion." Significantly, however, defendant does not identify what purported findings or documents the trial justice failed to

- 20 -

consider. To the extent that this issue has been appropriately preserved, we discern no abuse of discretion by the trial justice.

Next, we address defendant's contention that the trial justice was bound to use the appraisal award when determining damages under the doctrine of *res judicata*. "We review *res judicata* claims *de novo*." *Glassie v. Doucette*, 159 A.3d 88, 95 (R.I. 2017). "Res judicata 'makes a prior judgment in a civil action between the same parties conclusive with regard to any issues that were litigated in the prior action, or, that could have been presented and litigated therein.'" *Ritter v. Mantissa Investment Corporation*, 864 A.2d 601, 605 (R.I. 2005) (quoting *ElGabri v. Lekas*, 681 A.2d 271, 275 (R.I. 1996)). "It is our well-settled principle that '*res judicata* serves as a bar to a second cause of action where there exists: (1) identity of parties; (2) identity of issues; and (3) finality of judgment in an earlier action.'" *JHRW, LLC v. Seaport Studios, Inc.*, 212 A.3d 168, 177 (R.I. 2019) (brackets omitted) (quoting *Goodrow*, 184 A.3d at 1126).

The defendant's argument as to *res judicata* fails. "In order to establish identity of the parties, the parties to the earlier action must be in privity with the parties to the later action." *Huntley v. State*, 63 A.3d 526, 531 (R.I. 2013). "Privity exists where there is 'a commonality of interests' such that one party adequately represents the other's interests." *Id.* (brackets omitted) (quoting *Lennon v. Dacomed Corp.*, 901 A.2d 582, 590 (R.I. 2006)). There is no privity of parties here. The

- 21 -

instant suit is between Americo Mallozzi and Warwick Wings. The federal court suit was between Warwick Wings and Liberty Mutual. There are no facts nor any logic to support the notion that plaintiff here is in privity with Liberty. Additionally, the two cases involve very distinct causes of action. The instant case concerns claims of breach of contract and unjust enrichment, whereas the federal case involved a dispute between an insurance carrier and policyholder over the scope of coverage. We are satisfied that the doctrine of *res judicata* is inapplicable in this case.

## Attorneys' Fees

The defendant's final claim of error turns on whether the trial justice's award of attorneys' fees to plaintiff was proper. The defendant contends that, because attorneys' fees were not contemplated in the contract, they should not have been awarded here. Additionally, and more convincingly, defendant argues that there was a justiciable issue of either law or fact that prevented the application of G.L. 1956 § 9-1-45. In relevant part, the statute states that, in a case involving a breach of contract, the court may award "attorney's fees to the prevailing party" if the court "[f]inds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party * * *." Section 9-1-45. Neither party disputes that this case involved a breach-of-contract claim. The parties do, however, disagree as to whether there was a justiciable issue of fact or law.

"[T]he issue of whether there exists a *basis* for awarding attorneys' fees generally is legal in nature, and therefore our review of such a ruling is *de novo*." *Danforth v. More*, 129 A.3d 63, 72 (R.I. 2016) (quoting *Shine v. Moreau*, 119 A.3d 1, 8 (R.I. 2015)). "If it is determined that there is an adequate legal basis for such an award, then we review a trial justice's decision awarding or denying attorneys' fees for an abuse of discretion." *Id.* When considering the legal basis under § 9-1-45, we have said that, when "defendants did prevail in a civil action arising from a breach of contract, the trial justice thus ha[s] statutory authority to award attorneys' fees to defendants if, within [his] considerable discretion, [he] determined that they were warranted." *Arnold v. Arnold*, 187 A.3d 299, 316 (R.I. 2018).

In its papers to this Court, defendant's sole argument is that the trial justice failed "to make any finding of 'a complete absence of a justiciable issue of either law or fact raised by the losing party.'" Without identifying any "justiciable issue," its only elaboration was that the trial justice's decision "specifically details questions of law and fact raised by the parties during trial."

In exercising our *de novo* review to determine whether a basis exists for awarding attorneys' fees under § 9-1-45, we conclude that there was indeed a complete absence of a justiciable issue. This was a breach-of-contract action in which defendant failed to pay monies that were due and owing to plaintiff under the

terms of the contract. The trial justice correctly found that plaintiff based his architectural plans on the engineering plans of Nadeau and Odeh. We agree with the trial justice that "[c]learly, Warwick Wings understood that Mallozzi was proceeding with the plans based on the specifications of the engineers (replacement of roof trusses), and Warwick Wings recognized that Mallozzi was doing so. Indeed, there is no allegation that Mallozzi was told to follow other plans."

The trial justice held that defendant failed to establish that the contract was unilaterally cancelled or otherwise terminated, or that plaintiff's work was in any manner deficient. He further found as fact that "the contract was not impossible to perform." The trial justice concluded that "the only thing which frustrated the performance was defendant's failure to communicate with Mallozzi" and that, "[i]nstead of communicating with Mallozzi[,] the defendant simply ignored its contract and the bill." Under these circumstances, we are satisfied that there was a complete absence of justiciable issues.

Having determined that there is a legal basis for an award of attorneys' fees, our analysis shifts to the question of whether the trial justice abused his discretion. *See In re Estate of Cantore*, 814 A.2d 331, 334 (R.I. 2003). Importantly, here, however, defendant did not order the transcript from the hearing on attorneys' fees. The defendant filed its appeal and ordered the transcript after the trial but before the hearing on attorneys' fees took place, and no subsequent transcript was ever ordered.

Article I, Rule 11(a) of the Supreme Court Rules of Appellate Procedure requires that, "[p]romptly after filing the notice of appeal[,] the appellant shall comply with the provisions of Rule 10(b) or (c) and shall take any other action necessary to enable the clerk to assemble and transmit the record." Here, defendant alone was responsible for "ensur[ing] that the record is complete and ready for transmission." *Boulais v. DiPaola*, 305 A.3d 1270, 1271 (R.I. 2024) (mem.) (quoting *Small Business Loan Fund Corporation v. Gallant*, 795 A.2d 531, 532 (R.I. 2002)).

Without the transcript of the hearing on attorneys' fees, "this Court cannot determine how the trial justice came to a decision or, in turn, whether the trial justice erred in coming to that decision." *Boulais*, 305 A.3d at 1271. As such, without any record on the matter to review, we cannot say that the trial justice abused his discretion in awarding attorneys' fees to the plaintiff.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record may be returned to the Superior Court.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Americo Mallozzi aka Americo Mallozzi & Associates v. Warwick Wings, LLC. |
| **Case Number** | No. 2023-311-Appeal.<br>(PC 20-3773) |
| **Date Opinion Filed** | February 25, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Girard R. Visconti, Esq.<br>For Defendant:<br><br>Daniel Calabro, Jr., Esq. |